JAQUALIN FRIEND PETERSON (CA Bar #177515)
PECK LAW, LLC
785 North 400 West
Salt Lake City, Utah 84103
Tel. (801) 521-0844
Fax (801) 505-5007
jaqfriend@aol.com

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

| | |
|---|---|
| TERESA L. HAMMOND,<br>Plaintiff,<br>vs.<br>WAL-MART STORES, INC.,<br>Defendant | Case No. ________________________<br>**COMPLAINT**<br>**(Jury Demanded)** |

COMES NOW PLAINTIFF TERESA L. HAMMOND to complain and allege against Defendant Wal-Mart Stores, Inc. as follows:

**NATURE OF THE CASE**

1. This is an action against Wal-Mart Stores, Inc. ("Wal-Mart") seeking damages and redress for deprivation of, interference with, and retaliation in regards to Plaintiff's rights protected by the Family and Medical Leave Act of 1993, as amended ("FMLA"), 29 U.S.C. §2601, et seq. and for damages and redress for denial of and retaliation in regards to Plaintiff's rights protected by the Americans with Disabilities Amendments Act of 2008 ("ADAA"), 42 U.S.C. §12112(a), Pub. L. 110-325, § 2, Sept. 25, 2008, 122 Stat. 3553.

**PARTIES**

2. Plaintiff Teresa L. Hammond (Ms. "Hammond") resides in the State of California, Stanislaus County; at the times complained of herein, she was a Department Manager of the Wal-Mart Superstore in the Washington County, state of Utah, where she then resided. At the times complained of herein, Ms. Hammond had been working for Wal-Mart for at least 12 months and for at least 1,250 hours during the previous 12 month period.

3. Defendant Wal-Mart is a Delaware corporation with its principal place of business in Bentonville, Arkansas. It is registered to do business throughout the United States, including the states of Utah and California. At the times complained of herein, Wal-Mart employed more than 50 employees within a 75 mile radius and it otherwise meets the jurisdictional prerequisites of the FMLA, and it is an employer within the meaning of 29 U.S.C. §2611(4).

4. On or about February 19, 2010, and within 300 days of Wal-Mart's commission of the unlawful employment practices set forth herein, Ms. Hammond made her written complaint and initiated a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") regarding Wal-Mart's conduct. As of March 22, 2010, Wal-Mart was notified of her Charge. The official EEOC Charge was filed on May 18, 2010 with the EEOC. (Hammond's Charge of Discrimination, attached here as Ex. "A.")

5. On or about June 23, 2010, the EEOC issued and mailed a Notice of Right to Sue to Ms. Hammond. (Notice of Right to Sue, attached here as Ex. "B.") This Complaint is filed within 90 days of Ms. Hammond's receipt of that Notice.

**JURISDICTION AND VENUE**

6. Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. §§1331, 1343, and 42 U.S.C. §2000e-5(f)(3) in that this action arises under federal law, specifically the FMLA and the ADAA.

7. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), (c), and 42 U.S.C. 2000e-5(f)(3): Defendant conducts substantial business in this District and may be found and said to reside herein insofar as there are at least 217 Wal-Mart stores, supercenters, neighborhood markets, and discount stores in California where it employs over 70,000 employees. Wal-Mart has centralized workplace policies and a common set of personnel policies which it implements throughout its stores, including in Utah and California.

**FACTUAL ALLEGATIONS**

8. Ms. Hammond worked for Wal-Mart in Washington, Utah for ten (10) consecutive years prior to her termination May 29, 2009, plus two additional years from May 1995 through May 1997.

9. In Spring 2009, Ms. Hammond was a Department Manager. She took two months of approved FMLA leave to attend the Mayo-Clinic for her own serious health condition. Prior to her leave, in October 2008, Ms. Hammond required throat surgery and in-patient hospital care because of a condition which severely impaired her ability to breath. The treatment she received at the Mayo-Clinic was directly related to the throat surgery.

10. Ms. Hammond's physicians believed her condition was exacerbated by stress she was suffering in her job. Consequently, when she returned from FMLA leave, she approached store management about voluntarily stepping down from her Manager's position in an effort to reduce the amount of stress she was experiencing at work.

11. While discussing reassignment with her store management, she made a remark to the effect of "No matter where I end up, I'll probably get hurt." Ms. Hammond, having suffered several FMLA qualifying injuries and health issues during her employment with Wal-Mart made this remark as a self-deprecating reference to her prior injuries and health problems. In response to Ms. Hammond's comment, an assistant manager who was present suggested that Ms. Hammond might want to quit her job if she was worried about getting hurt.

12. Within days of her return to work from FMLA leave, Wal-Mart provided Ms. Hammond a performance evaluation on or about May 5, 2009. In it, Wal-Mart assessed her as meeting expectations in all areas, and stated that Ms. Hammond knows "what needs to be done and has knowledge to do it. She is what is considered as a go to person by many people due to this knowledge. . . . Teresa also works well with others and can be a motivator."

13. The only area listed on her evaluation as an "Area for Improvement" was that "Teresa has had some medical issues in the past that caused her to have some attendance issues. Teresa is trying to regain her drive and focus on her work." The evaluation failed to list her number of days absent and indicated a question mark ("?") instead of an actual number of days

absent. Ms. Hammond's response to this criticism was that, "I would like to improve my work attendance. I should be able to do this as I get my medical situation under control."

14. Similarly, Ms. Hammond's 2008 performance evaluation stated that she met and often exceeded Wal-Mart's expectations. However, Wal-Mart criticized her attendance, stating it was the "biggest" area for improvement; in 2008, she was listed as absent for 10 days. Nonetheless, she was also characterized in her evaluation overall as meeting expectations.

15. Ms. Hammond's absences in 2008 and in 2009 were primarily for her own serious health condition and qualified for FMLA protection.

16. When she returned from her two month FMLA leave in early May 2009, Ms. Hammond had not yet exhausted all of her FMLA leave to which she was entitled for 2009. At that time, she informed Wal-Mart's personnel manager of her need for continued intermittent FMLA leave for her own serious health condition.

17. Wal-Mart terminated Ms. Hammond within three weeks of her informing Wal-Mart of her need for intermittent FMLA leave, before she could complete the necessary FMLA paperwork associated with her requested leave.

18. On May 22, 2009, a week prior to her termination, Ms. Hammond suffered a knee injury while operating a fork lift at work. She immediately went to Wal-Mart's off-site doctor at "Intermountain WorkMed," who sent her back to work because she could not complete a medical evaluation on her knee due to the extreme pain it caused her. For instance, the doctor could not x-ray Ms. Hammond's knee because she could not flex it due to pain.

19. Wal-Mart's doctor returned Ms. Hammond to work on May 22, 2009 after the injury on "light duty": no kneeling or squatting, no prolonged standing, no use of her right knee, and walking only with crutches. The doctor also referred her to an orthopedist. Upon information and belief, the doctor's Return to Work Summary containing these restrictions was provided to Wal-Mart on or about May 22, 2009.

20. Wal-Mart incorporates and enforces a standard personnel policy in all of its stores that if an employee is injured on the job and cannot perform her normal job, so long as she can sit, she is to continue working doing something.

21. Due to her injury, Ms Hammond could not perform the essential functions of her normal job as Department Manager; thus, the day after her injury and according to its personnel policies, Wal-Mart transferred Ms. Hammond to the position of greeter, sitting by the front door, where she worked eight (8) hours a day.

22. Wal-Mart failed to inform Ms. Hammond that her injury qualified her for FMLA protection. Thus, Ms. Hammond acceded to Wal-Mart's light duty policy and did not ask for FMLA leave in regards to her knee injury. Ms. Hammond believed that her job would be in jeopardy if she took leave, after being criticized for her absences in her recent evaluation.

23. Ms. Hammond had to use a scooter in order to get around the store due to the pain she experienced with her injured knee. At the end of her first day working as a greeter – which was the day after her injury – Ms. Hammond's pain was so bad that she went to the hospital of her own accord after work and had x-rays done. The x-rays showed no bone damage.

24. On May 23, 2009, the day after her injury and the day Wal-Mart transferred Ms. Hammond to the greeter position, Ms. Hammond's co-manager, Kelly Cunningham, and the store's Assistant Manager, Madge Nelson, met with Ms. Hammond and informed her that they were going to have to fire her immediately because she was not certified to operate a fork lift.

25. Ms. Hammond objected to her termination, based on the fact that she indeed had the proper certification to operate a forklift. Ms. Nelson and Mr. Cunningham told Ms. Hammond that she would have to prove that she was certified to operate the forklift; they also said they would research the paperwork and get back to her. Consequently, she was not immediately terminated and she continued her work as a greeter.

26. Although Wal-Mart's doctor had recommended that Ms. Hammond be seen by an orthopedist, Wal-Mart refused to authorize the visit because it claimed she was injured using equipment she not certified to use (*i.e.*, the forklift).

27. Ms. Hammond was allowed to continue working as a greeter during Wal-Mart's purported investigation of the forklift certification issue; Ms. Hammond provided Wal-Mart with documentary proof of her current forklift operation certification within a few days of the May 22, 2009 meeting, and prior to her termination.

28. Immediately after the accident, Ms. Hammond began going to physical therapy three times per week, during work hours, as prescribed by Wal-Mart's doctor.

29. Although Wal-Mart had a short-term disability program, Ms. Hammond did not apply for it because she was required to work a full schedule as a greeter pursuant to Wal-Mart's policy regarding employees injured on-the-job.

30. On May 29, 2009, a week after her injury, Ms. Hammond's store manager, Kurt Harbin, and another co-manager, Betty Kelley, met with Ms. Hammond and acknowledged that her forklift certification was in good standing.

31. Despite her forklift certification being in good standing, Mr. Harbin and Ms. Kelley told Ms. Hammond she was still being fired because of her previous comment that no matter what she did, there was a chance she would get hurt. Ms. Kelley stated that Ms. Hammond was setting herself up for a fake injury and that she was a liability to Wal-Mart.

32. Wal-Mart's termination papers, which were signed by Mr. Harbin and Ms. Kelley, state that Ms. Hammond was fired for "Gross Misconduct – Integrity Issue (Theft, Violent Act, Dishonesty, Misappropriation of Company Assets)," and Mr. Harbin said during the termination interview that Ms. Hammond was not eligible for rehire; in fact, the alleged grounds for Ms. Hammond's termination made it mandatory under Wal-Mart's policy that Ms. Hammond was ineligible for rehire.

33. Notwithstanding that Kurt Harbin fired Ms. Hammond on May 29, 2009 – ostensibly for a Gross Misconduct-Integrity Issue, he signed off on her May 5, 2009 performance evaluation on June 8, 2009, which memorialized that her performance met Wal-Mart's expectations.

34. Wal-Mart's policy in regards to providing its terminated employees with COBRA[1] benefits was that employees terminated for gross misconduct were not eligible to receive COBRA benefits.

---

[1] The Consolidated Omnibus Budget Reconciliation Act ("COBRA") provides an employee with the right to choose to continue group health benefits provided by the employer's group health plan following termination for a limited time and under certain circumstances of voluntary or involuntary job loss.

35. Wal-Mart allowed Ms. Hammond to elect COBRA benefits following her termination, suggesting that she was not actually terminated for gross misconduct.

36. Following her termination, Ms. Hammond applied for unemployment benefits. During the course of Ms. Hammond's application for unemployment benefits, Wal-Mart continued to represent to UDWS that she was fired for having operated the forklift without certification. When pressed by UDWS to provide documentation to substantiate the reason for termination, Wal-Mart could provide no substance for the forklift authorization issue; instead, Wal-Mart sent Ms. Hammond's attendance records to DWS to substantiate her termination, thereby suggesting that it was her absences which were the true reason for her termination.

37. Utah's Department of Workforce Services ("UDWS") allowed Ms. Hammond to collect unemployment benefits, determining that she was not at fault in her discharge by Wal-Mart. Wal-Mart did not appeal the UDWS decision.

38. A few weeks after her termination, Wal-Mart finally approved Ms. Hammond to have an MRI done on her knee, which showed that she had a torn meniscus. She eventually had to have surgery on or about July 23, 2009 to repair the tear. She was released to return to work and activity as of September 16, 2009 although she would continue to require medications, physical therapy and possible injections to treat the injury beyond September 16, 2009.

39. The same Personnel Manager with whom Ms. Hammond discussed her need for continuing and intermittent FMLA leave in early May 2009 misrepresented to Claims Management, Inc. (Wal-Mart's wholly-owned third party adjusting company that handles its workers compensation claims) that Ms. Hammond was not authorized to be operating a forklift when she was injured. Upon information and belief, this same Personnel Manager made the same misrepresentation to UDWS in an effort to deny Ms. Hammond unemployment benefits.

40. Wal-Mart denied Ms. Hammond's workers compensation claim, stating that her injury was not caused by work.[2]

41. Ms. Hammond was required to undergo surgery for her knee injury, which was characterized by Wal-Mart's doctor as a permanent injury and required several months of

[2] Ms. Hammond is still fighting her workers compensation claim with Wal-Mart.

therapy and recuperation before it healed, and she was unable to return to work until September 16, 2009. She still suffers a permanent whole body impairment of at least 1% and a lower extremity impairment of 2% as a result of the knee injury. At the time of her injury and during her rehabilitative period, her musculoskeletal functions were significantly impaired, as were her abilities to walk, sit, stand, lift any external weight, and bear her own weight. She also experienced significant pain and sleep deprivation as a result of the injury and her impaired ability to move her right leg and knee.

42. Having been terminated from her job with Wal-Mart, and although she was deemed eligible for COBRA benefits, she was financially unable to continue with COBRA benefits. She has since only been able to obtain minimal health insurance which would fit within her financial means. As a result, she has suffered additional medical expenses and has had to forego certain medical treatment which would otherwise have been covered by her health insurance through Wal-Mart had she not been fired.

43. Following her termination and as a result of her injury, Ms. Hammond has been unable to find interim employment; consequently, on or about October 7, 2009, she had to move in with a family friend in Oakdale, California because she was financially destitute and would have otherwise been rendered homeless. She continues to reside in Oakdale, California with that family friend as of the filing of this action.

44. On or about February 12, 2010, Ms. Hammond initiated a Charge of Discrimination with the EEOC claiming discrimination under the ADAA as a result of her knee injury, and on or about March 6, 2010, Wal-Mart was informed of the Charge.

45. The EEOC deemed her Charge to be timely, and issued her a Notice of Right to Sue on June 23, 2010. (See, Ex. "B.")

**FIRST CAUSE OF ACTION**
**(Violation of the FMLA - Interference)**

46. Paragraphs 1 through 45 are incorporated here as if fully set forth.

47. Ms. Hammond took approved FMLA leave for two months in the spring of 2009, returning to work on or about May 5, 2009; the approved leave did not exhaust her FMLA entitlement.

48. When she returned to work, Ms. Hammond informed Wal-Mart's personnel manager of her continued need for FMLA leave on an intermittent basis as a result of her own serious health condition, which rendered her unable to perform the essential functions of her job.

49. The personnel manager acknowledged her request, and instructed Ms. Hammond to provide required FMLA paperwork to support her request for intermittent leave.

50. The FMLA, 29 U.S.C. §2612(a)(1) provides,

> [A]n eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

51. The FMLA, 29 U.S.C. §2612(b) provides that leave for an employee's own serious health condition may be taken on an intermittent or reduced leave schedule.

52. Upon returning from FMLA leave, Ms. Hammond was provided a personnel evaluation which specifically criticized her for her absences and denoted her attendance as a specific area for improvement.

53. The FMLA prohibits an employer from using the taking of FMLA leave as a negative factor in employment actions, nor can FMLA leave be counted under an employer's "no-fault" attendance policy.

54. On May 22, 2009, Ms. Hammond injured her right knee at work, tearing her meniscus. Her injury rendered her unable to perform the essential functions of her job as Department Manager, it lasted more than three consecutive days, it required two or more visits to a doctor within a thirty-day period, and it required surgery, ongoing care and frequent physical therapy treatments per week.

55. Despite that she was unable to complete a medical evaluation with Wal-Mart's doctor because of the pain she suffered on May 22, 2009, Wal-Mart nonetheless required Ms.

Hammond to attend work as a greeter based on its policy requiring injured employees who cannot perform their normal jobs to return to work doing something so long as they can sit.

56. The FMLA precludes an employer from transferring an employee to an alternative position in order to discourage the employee from taking leave or otherwise cause a hardship to the employee.

57. The FMLA further prohibits an employer from requiring an employee to accept a light-duty position following an on-the-job injury, notwithstanding certification by the workers' compensation health care provider that the employee can return to work on light duty.

58. Ms. Hammond was unable to perform the essential functions of her job as a Department Manager due to the knee injury; thus, notwithstanding that she could sit and work as a greeter, her injury qualified her for FMLA protection. Wal-Mart's policy requiring Ms. Hammond to transfer to the greeter position discouraged her from taking leave and caused her continued and excessive pain.

59. Wal-Mart further denied Ms. Hammond's ability to have the injury further and timely evaluated by an orthopedist, claiming that she was not authorized to operate the forklift. Once she was seen by an orthopedist, however, she required surgery to repair her torn meniscus and further time off for rehabilitation and recovery. The surgery and subsequent rehabilitation time would have qualified for FMLA protection.

60. Ms. Hammond was referred by Wal-Mart's doctor for physical rehabilitation three times a week; these visits qualified for FMLA protection.

61. Under the FMLA, Wal-Mart has the obligation to inform its employees of their FMLA rights and protections when they cannot perform the essential functions of their job due to an FMLA-qualifying serious health condition.

62. Notwithstanding that Wal-Mart received medical information from its own doctor regarding Ms. Hammond's condition, her inability to perform the essential functions of her job as Department Manager, and her need for continuing care, Wal-Mart failed to inform Ms. Hammond that her knee injury and related treatments qualified her for FMLA protection and that she was not required to accept a light duty position. Instead, it transferred her to a greeter

position under its policy requiring injured employees to continue to work so long as they could sit.

63. On May 29, 2009, before she could provide the Personnel Manager with the FMLA paperwork in conjunction with her intermittent FMLA leave request, Wal-Mart fired Ms. Hammond, alleging she engaged in gross misconduct.

64. Wal-Mart's actions in failing to inform Ms. Hammond about her FMLA rights and protections in regards to her knee injury, and its termination of her following her request for intermittent FMLA leave and a work-related injury that the company knew required ongoing treatment constitutes an interference with Ms. Hammond's FMLA rights in violation of 29 U.S.C. §2615(a)(1).

65. Wal-Mart's use of Ms. Hammond's attendance records as a negative factor and justification for her termination is an interference with Ms. Hammond's FMLA rights under 29 U.S.C. §2615(a)(1).

66. Wal-Mart's policy requiring injured employees who cannot perform the essential functions of their job to accept reassignment and to continue working so long as they can sit, notwithstanding that the injury may qualify for FMLA, is intended to discourage workers from taking FMLA leave and subjects them to other hardships. Further, the practical effect of the policy is to require employees to accept a light duty position in lieu of FMLA leave. As such, the policy is a *per se* violation of the FMLA and it constitutes an interference with its employees' FMLA rights and protections, including as it was applied to Ms. Hammond, in violation of 29 U.S.C. §2615(a)(1).

67. Wal-Mart's conduct violated the FMLA, 29 U.S.C. §2615(a)(1), and pursuant to 29 U.S.C. §2617, Wal-Mart is liable to Ms. Hammond for all wages and wage increases to which she would have been entitled but for Wal-Mart's conduct, as well as profit sharing, employee benefits, and other compensation that she lost due to Wal-Mart's violation of the FMLA, plus special and out-of-pocket damages, prejudgment interest on her economic losses, and an additional amount as liquidated damages equal to her damages plus prejudgment interest thereon,

reasonable attorney's fees, reasonable expert witness fees and any other costs of this action, and such other and further relief as this Court deems appropriate (including front pay).

**SECOND CAUSE OF ACTION**
**(Violation of FMLA – Retaliation)**

68. Paragraphs 1 through 67 are incorporated here as if fully set forth.

69. In addition to interfering with Ms. Hammond's FMLA rights, as set forth above, Wal-Mart also retaliated against her for exercising and/or attempting to exercise her FMLA rights when it criticized her for absenteeism and then terminated her employment within three weeks of her return to work from protected FMLA leave and within three weeks of her request for continued FMLA leave on an intermittent basis.

70. Wal-Mart further retaliated against Ms. Hammond for her exercise and attempted exercise of her FMLA rights when it endeavored to deny her unemployment benefits based on her attendance records.

71. Wal-Mart's conduct violated the FMLA, 29 U.S.C. §2615(a)(2), and it is liable to Ms. Hammond for all wages and wage increases, health insurance and all other employee benefits and other compensation to which she would have been entitled but for Wal-Mart's conduct, as well as prejudgment interest on those losses, and an additional amount as liquidated damages equal to her damages plus prejudgment interest thereon, reasonable attorney's fees, reasonable expert witness fees and any other costs of this action, and for such other and further equitable relief as this Court deems appropriate (including front-pay).

**THIRD CAUSE OF ACTION**
**(Violation of ADAA)**

72. Ms. Hammond incorporates ¶¶1 through 71 here as if fully set forth.

73. At all times relevant to this action, Ms. Hammond was disabled within the meaning of 42 U.S.C. §12102, as amended.

74. Wal-Mart is a covered entity under the ADAA and within the meaning of 42 U.S.C. §12101, *et seq*., as amended.

75. At all times relevant to this action, Ms. Hammond was a qualified individual with a disability who was able to perform the essential functions of her job, with a reasonable accommodation in the form of leave for medical treatment and care, adherence to her medical restrictions (including no weight bearing on her right leg, no stooping, kneeling, prolonged standing or sitting, and the use of ambulatory assistance until such time as her knee injury healed, among other accommodations appropriate under the circumstances.

76. Notwithstanding whether Ms. Hammond's knee injury qualified as a disability under the ADAA, Wal-Mart nonetheless perceived Ms. Hammond's injury as a disability and as a liability to Wal-Mart that would require ongoing medical care and treatment, light or modified job duties, and time off work.

77. Wal-Mart knew of Ms. Hammond's disability, regarded her as disabled, and/or knew she had a record of such disability. It nonetheless terminated her, at least in part, on the basis of her disability or perceived disability.

78. Despite Wal-Mart's knowledge of Ms. Hammond's actual and/or perceived disability and her perceived need for accommodation to allow Ms. Hammond to fully perform the essential functions of her job, Wal-Mart failed to accommodate her.

79. Wal-Mart also knew of Ms. Hammond's need for reassignment to a less stressful position following her use of approved FMLA leave, it knew of her need for additional intermittent leave, and it knew of her need for continuing care and treatment in regards to her health problems caused by the stress she suffered on the job. It nonetheless terminated her employment because of her health issues and related absences, and its perception that she was a liability.

80. Wal-Mart's conduct violates the ADAA and as a result of such violation, Ms. Hammond is entitled to recover her compensatory damages in an amount to be established at trial, including her lost wages, benefits, and front pay in lieu of reinstatement.

81. Wal-Mart's actions were willful and intentional and as such, Ms. Hammond is entitled to punitive damages in an amount to be determined at trial.

82. Ms. Hammond is also entitled to recover her reasonable attorney's fees and costs incurred herein.

**FOURTH CAUSE OF ACTION**
**(Failure to Meaningfully Engage in the Interactive Process)**

83. Ms. Hammond incorporates ¶¶1 through 82 here as if fully set forth.

84. The ADAA requires employers to accommodate the known disabilities of their employees.

85. The ADAA further requires an employer to engage in good faith and in an interactive process with its disabled employees to determine a reasonable accommodation with respect to their jobs, and the time and manner in which such jobs are performed.

86. Wal-Mart failed to engage in a meaningful and good faith interactive process with Ms. Hammond and failed to provide her with a reasonable accommodation. Ms. Hammond could have continued to perform her job (or a similar position) with reasonable accommodation.

87. Wal-Mart's conduct violated the ADAA, and as such, Ms. Hammond is entitled to recover her compensatory damages in an amount to be determined at trial, including lost wages and benefits.

88. Wal-Mart's conduct was willful and intentional and as such, Ms. Hammond is entitled to punitive damages in an amount to be determined at trial

89. Ms. Hammond is further entitled to recover her reasonable attorney's fees and costs incurred herein.

**FIFTH CAUSE OF ACTION**
**(Special Damages)**

90. Paragraphs 1 through 89 are incorporated here as if fully set forth.

91. Ms. Hammond suffered a readily ascertainable loss of wages and benefits as a result of Wal-Mart's actions, and as such, she is entitled to prejudgment interest on those losses.

92. Ms. Hammond also incurred medical expenses and further loss as a result of Wal-Mart's actions, as to which she is entitled to reimbursement, plus accrued interest.

**JURY DEMAND**

Plaintiff hereby requests a trial by jury pursuant to Fed. R. Civ. P. 38 on all issues which are triable to a jury.

**CLAIM FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Wal-Mart as follows:

A. On her First and Second Causes of Action, for judgment determining that Wal-Mart violated the FMLA and is therefore liable to Ms. Hammond for damages equal to her wages, salary, employment benefits, or other compensation which were denied or lost to her as a result of Wal-Mart's violation of the FMLA;

B. For prejudgment interest on her wages, salary, employment benefits, or other compensation lost or denied to Ms. Hammond as a result of Wal-Mart's FMLA violations;

C. For liquidated damages in an amount equal to the sum of the amounts awarded in A and B above;

D. On her Third, Fourth and Fifth Causes of Action, for Plaintiff's compensatory damages (including lost wages and benefits), special damages including prejudgment interest, and punitive damages in an amount to be established at trial;

E. For Plaintiff's reasonable attorneys' fees, reasonable expert witness fees, and any other costs of the action;

F. For post-judgment interest on all amounts awarded to Ms. Hammond herein accruing from the date of judgment to the date of satisfaction of judgment awarded herein; and,

G. For such other and further equitable relief as this Court deems appropriate under the circumstances (including employment, reinstatement, and promotion).

DATED this 24th day of September, 2010.

PECK LAW, LLC

By: /s/ Jaqualin Friend Peterson
Attorneys for Plaintiff
785 North 400 West
Salt Lake City, UT 84103